## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **INTERSTATE FIRE & CASUALTY COMPANY,** | § § § | |
| **Plaintiff,** | § § § | |
| **v.** | § § | |
| **CATHOLIC DIOCESE OF EL PASO,** | § § § | |
| **Defendant.** | § § | **EP-12-CV-00221-DCG** |
| | § § | |
| **CATHOLIC DIOCESE OF EL PASO,** | § § | |
| **Counter-Plaintiff,** | § § § | |
| **v.** | § § | |
| **INTERSTATE FIRE & CASUALTY COMPANY,** | § § § | |
| **Counter-Defendant.** | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A non-jury trial of this cause was scheduled to commence on June 24, 2013 (ECF No. 29). Thereafter, the parties jointly moved to continue the trial setting for mid-August. *See* Joint Mot. to Continue 2, ECF No. 30. Upon reviewing the parties' joint motion as well as the parties' pretrial filings in accordance with Local Court Rules 16(e) and (f) of the Western District of Texas and the Court's orders, the Court concluded that with all counsels' agreement, this matter could be evaluated more thoroughly and expeditiously upon written submissions.[1] The Court, having considered all pleadings heretofore filed herein, the pre-trial filings, the trial briefs,

---

[1] *See Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 399 n.1 (5th Cir. 2003) (noting that no party objected to the district court conducting a trial on written submissions).

including the parties' joint exhibit list,[2] the joint stipulation of facts, the arguments of counsel, and the applicable law, hereby enters its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.  Nature of the Case

The case arises from an insurance coverage and apportionment dispute concerning the settlement of an underlying suit.  Plaintiff Interstate Fire & Casualty Company seeks a declaration that it has no duty to indemnify the insured and, in the alternative, that the underlying settlement be apportioned and allocated based on the responsibility of the named defendants in the underlying suit.  Likewise, Defendant Catholic Diocese of El Paso seeks judgment declaring that Plaintiff Interstate Fire & Casualty Company has a duty to indemnify and alleges breach of contract, violation of the Texas Deceptive Trade Practices Act and the Texas Insurance Code, and breach of duty of good faith.

## II.  Findings of Fact[3]

*A.  The Parties*

1.      Plaintiff/Counter-Defendant Interstate Fire & Casualty Company ("Interstate") is an Illinois corporation with its principal place of business in Illinois.

2.      Defendant/Counter-Plaintiff Catholic Diocese of El Paso (the "Diocese") is a religious organization situated in El Paso County, Texas.

*B.  The Insurance Policies*

3.      Interstate issued policies of excess indemnity insurance to the Diocese covering policy periods from February 5, 1979, through April 1, 1986.

---

[2]  The parties submitted a joint exhibit list and jointly filed their exhibits.  Neither party disputes the admissibility of any of the exhibits.

[3]  The Court's findings are largely based on the parties' joint stipulation of facts.  *See* Joint Facts, ECF No. 24.

4.    The Interstate Indemnity Policy provides a total of $4,800,000 of reimbursement

coverage to the Diocese in excess of $200,000 paid by the Diocese under its self-insured

retention obligation and its primary indemnity coverage through Lloyd's of London

("Lloyd's"). *See* Trial Exs. 1–3.

5.    The Interstate Indemnity Policy is a "follow form" excess indemnity policy that

incorporates the provisions of the immediate underlying policy subject to exclusions. *See*

Trial Ex. 3, at 3 [hereinafter Interstate Policy].

6.    The above policies list the Roman Catholic Diocese of El Paso and the Bishop of the

Roman Catholic Diocese of El Paso and His Successors as named insureds.

7.    The insuring agreement for the Interstate Indemnity Policy provides that:

> To indemnify the insured for the amount of loss which is in excess of the
> applicable limits of liability of the underlying insurance inserted in column
> II of item 4 in the declarations; provided that this policy shall apply only
> to those coverages for which a limit of liability is inserted in column I;
> provided further that the limit of the company's liability under this policy
> shall not exceed the applicable amount inserted in column I.
>
> The provisions of the immediate underlying policy are incorporated as a
> part of this policy except for any obligation to investigate and defend and
> pay for costs and expenses incident to the same, the amount of the limits
> of liability, any "other insurance" provision and any other provisions
> therein which are inconsistent with the provisions of this policy.

*See* Interstate Policy 3.

8.    The term "loss" is defined by endorsement number four in the Interstate policy. *See*

Interstate Policy 10.   The endorsement defines the term "loss" as follows:

> [S]um paid as damages in settlement of a claim or in satisfaction of a
> judgment for which the insured is legally liable, after making deductions
> for all recoveries, salvages and other insurances (whether recoverable or
> not) other than the underlying insurance and excess insurance purchased
> specifically to be in excess of this policy. . . includ[ing] investigation,
> adjustment, defense or appeal costs, and expenses, costs and expenses

incident to any of the same, notwithstanding that the underlying insurance may provide insurance for such costs and expenses.

*See* Interstate Policy 10.

9.    Pursuant to the provisions of "the immediate underlying policy"—that is, Lloyd's

policy—the term "occurrence" is defined as follows:

> [A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

*Accord* Interstate Policy 3, *with* Trial Ex. 2, at 16 [hereinafter J.A. Lloyd Policy].

*C.   The Diocese's Relationship with Other Involved Parties*

10.   The allegations of the underlying lawsuit are against Defendants the Diocese, the

Brothers of the Christian Schools ("NOSF"), and Brother Samuel F. Martinez, F.S.C.

("Brother Martinez").

11.   The allegations of the underlying lawsuit are alleged to have occurred at Cathedral High

School in El Paso, Texas.

12.   At the time of the underlying lawsuit, the Diocese owned Cathedral High School

("Cathedral High").

13.   The Diocese entered into annual contracts with the NOSF to supply brothers to teach and

act as administrators at Cathedral High.  *See* Trial Ex. 4 [hereinafter Diocese Contract].

14.   With respect to Cathedral High, the contract between the Diocese and NOSF provides as

follows:

(a)    the Diocese and NOSF agree to recognize the Bishop's responsibility to

provide for Christian education of the youth of the Diocese;

(b)    the Principal of Cathedral High is appointed by NOSF;

- 4 -

    (c)     the Principal and the Cathedral High Board are collegially responsible for the preparation of the school's annual budget which is to be submitted to the Bishop;

    (d)     the Principal organizes, supervises, and administers the institutional program of Cathedral High in accordance with the philosophy and policies defined by the Diocesan Board of Education;

    (e)     the Principal hires teachers and staff in accordance with the policies of the Diocesan Board of Education; and

    (f)     the Principal, after consultation with the faculty, selects textbooks in accordance with the standards of the Diocesan Board of Education.

15.    Brother Martinez, F.S.C., was a member of NOSF and was not a priest within the Diocese.

16.    Brother Martinez was initially assigned by NOSF in 1972 to work as a teacher at Cathedral High.

17.    From 1974 to 1975, Brother Martinez was named by NOSF as the Assistant Principal of Cathedral High.

18.    In 1976, Brother Martinez was appointed by NOSF to be the Principal of Cathedral High.

19.    Brother Martinez was at Cathedral High for a total of thirteen years. During that time period, Brother Martinez reported to his provincial and to the Cathedral High Board. He also reported to the Bishop of El Paso, Texas, in connection with the annual school budget.

20.    During his tenure at Cathedral High, Brother Martinez allegedly molested ten (10) young men.

21.    NOSF and Brother Martinez are not named as insureds under the above policies.  All

        parties concede that the Diocese, NOSF, and Brother Martinez have never asserted that

        NOSF and/or Brother Martinez are insureds under Interstate or Lloyd's policies.

*D.   The Underlying Lawsuit*

22.    In 2009, J.A. and his wife D.A. filed a lawsuit ("Texas lawsuit") in the County Court of

        El Paso, Texas.  The case was subsequently non-suited and re-filed in the First Judicial

        District, County of Santa Fe, New Mexico (the "New Mexico lawsuit") before Judge

        Sarah Singleton.

23.    A.M. was added as a plaintiff to the New Mexico lawsuit. *See J.A. et al. v. NOSF, Inc.,*

        *et al.*, No. D-101-CV-2009-03538 (Santa Fe Dist. Ct., N.M. Oct. 30, 2009).

24.    The Diocese, NOSF, and Brother Martinez are identified as party-defendants in the New

        Mexico lawsuit.

25.    J.A. and A.M. sought the recovery of damages for alleged sexual abuse and molestation

        while they were students at Cathedral High in El Paso, Texas; D.A. sought damages for

        loss of consortium.

26.    Plaintiffs alleged the following causes of action in the New Mexico lawsuit: (i) battery;

        (ii) failure to warn and negligent hiring, retention, and supervision; (iii) negligence; (iv)

        negligent and intentional infliction of emotional distress; and (v) vicarious liability. *See*

        Trial Ex. 5 [hereinafter N.M. Lawsuit Compl.].

27.    J.A. alleged that the sexual abuse and molestation occurred in 1982.

28.    A.M. alleged that the sexual abuse and molestation occurred in 1978.

29.    Both J .A. and A.M. alleged that they never informed their parents, the police, or anyone

        associated with the Diocese about the alleged abuse.

30.     The parties concede that there is no evidence that shows that the Diocese had actual
        knowledge that Brother Martinez sexually abused any minors until approximately 1990.

31.     During Brother Martinez's tenure at Cathedral High, there were no claims of abuse.
        After Brother Martinez left Cathedral High, there have been at least ten (10) claims of
        sexual abuse by former students.  The names of all ten individuals, who alleged to have
        been abused by Brother Martinez, were listed as witnesses for plaintiffs in the New
        Mexico lawsuit.  If the New Mexico lawsuit had proceeded to trial, the witnesses were
        expected to testify about their experiences concerning Brother Martinez's sexual abuse.

32.     In the New Mexico lawsuit, NOSF asserted that it was aware of only one prior allegation
        of sexual abuse involving Brother Martinez.  The instance of sexual abuse was allegedly
        performed prior to Brother Martinez coming to El Paso, Texas, to serve as the Principal
        at Cathedral High.  If the New Mexico lawsuit had proceeded to trial, a brother of NOSF
        was expected to testify that he fired Brother Martinez because of an incident that
        occurred at a school in Louisiana in the 1970s.  Moreover, the brother would testify that
        he believed that it was not appropriate for Brother Martinez to work in a school with
        boys, and that he "would never [have] hire[d] him."  J. Facts 6.  NOSF further intended to
        assert that it never informed the Diocese of the incident or information.

33.     William Foote, a psychologist from Albuquerque performed a psychological examination
        of J.A.  Based on his evaluation, Dr. Foote concluded that J.A. had a great risk of
        committing suicide.  The psychologist employed by the Diocese could not dispute J.A.'s
        suicide risk.

34.     It was also revealed by the parties that the Diocese had previously been sued in two other
        cases involving allegations of abuse by Brother Martinez.  The first case is styled *John*

*Doe I v. NOSF, Inc., Diocese of El Paso et al.*, No. 2003-847 (346th Dist. Ct., El Paso Cnty., Tex. March 4, 2003) (hereinafter *John Doe I*). The named defendants are as follows: De Salle Christian Brothers, the Catholic Diocese, Samuel F. Martinez, NOSF, Inc., and Armando X. Ochoa. *John Doe I* settled for approximately $1,000,000. Of that amount, NOSF agreed to pay $900,000, and the Diocese through its insurance carrier, Lloyd's, agreed to pay $100,000.

35.   Another case, filed in 2004 in El Paso County, Texas, is styled *John Doe v. NOSF, Inc., Diocese of El Paso et al.*, No. 2004-2256 (Cnty. Ct. at Law No. 5, El Paso Cnty., Tex. May 21, 2004) [hereinafter *John Doe II*]. The named defendants are as follows: the Catholic Diocese of El Paso, NOSF, Inc., Samuel F. Martinez, and Armando X. Ochoa. *John Doe II* settled for approximately $1,000,000. Of that amount, NOSF agreed to pay $700,000, and the Diocese agreed to pay $300,000, of which Lloyd's, its underlying insurance carrier, agreed to pay $60,000.

36.   After *John Doe II* reached a settlement agreement, the Diocese learned that the funds used by NOSF came out of the Brother's Retirement Fund. In September 2011, NOSF informed the Diocese that they were financially unable to contribute to a settlement and had no insurance coverage.

37.   Plaintiffs J.A., D.A., and A.M. and their counsel were aware of the settlement amounts reached in the *John Doe I* and *John Doe II* cases.

E.   *Mediation of the Underlying Suit*

38.   Pursuant to a court order, the parties of the New Mexico lawsuit were required to attend mediation before January 2012. Mediation was held in El Paso, Texas, on December 19, 2011.

39.    Prior to mediation, on December 14, 2011, the Diocese received a demand from counsel for J.A. and A.M.  The settlement demand for A.M. was $1,500,000 and the settlement for J.A. and his wife was $4,500,000.  *See* Trial Ex. 6 [hereinafter Settlement Demand].

40.    Prior to mediation, NOSF represented to the Diocese and to plaintiffs' counsel that NOSF was financially unable to contribute to a settlement for any of the named plaintiffs in the New Mexico lawsuit.  The Diocese sent Father Tony Celino and Father Rick Matty to New Orleans, Louisiana, in an attempt to confirm NOSF's inability to pay.

41.    At the onset of mediation, the Diocese and NOSF were situated in separate rooms.

42.    At mediation, the Diocese negotiated with A.M.'s counsel and settled the case for $400,000.  A mediated settlement agreement was prepared and signed on December 19, 2011.  *See* Trial Ex. 7 [hereinafter A.M. Agreement].  A formal settlement agreement and release was executed on December 21, 2011, a copy of which is designated as Exhibit 8 (hereinafter A.M. Settlement Agreement).  The agreement and release provided, *inter alia*, that the following be released and discharged: (i) the Diocese, Most Reverend Armando X. Ochoa, and all of the Diocese's related entities, officers, attorneys, employees, and priests; (ii) NOSF and its related entities, officers, attorneys, employees, and brothers; and (iii) Brother Martinez.  *See* A.M. Settlement Agreement 3.

43.    At mediation, the Diocese negotiated with J.A. and D.A.'s counsel and settled the claims asserted against the Diocese for $1.2 million.

44.    A mediated settlement agreement between the Diocese and J.A. and D.A.'s counsel was prepared and handwritten on December 19, 2011.  *See* Trial Ex. 9 [hereinafter J.A. & D.A. Agreement].

- 9 -

45.   After the Diocese reached a settlement agreement with the plaintiffs, NOSF requested the Diocese to assist in negotiating a release of NOSF from J.A.'s claims.

46.   The parties amended the J.A. & D.A. Agreement to include Defendants NOSF and Brother Martinez.

47.   The J.A. & D.A. Agreement states that the "Diocese . . . agrees to pay $1,200,000 for full settlement of all claims." *Id.*  The agreement was signed by all representatives for the plaintiffs, Diocese, NOSF, and Brother Martinez. *Id.*

48.   At the conclusion of mediation, NOSF informed the Diocese that it would contribute $110,000 towards the total settlements reached by the Diocese in the New Mexico lawsuit.

F.   *Settlement Agreement and Sums Paid in the Underlying Suit*

49.   A formal settlement agreement and release was executed on January 17, 2012, a copy of which is designated as Exhibit 10 (hereinafter Settlement Agreement and Release).  The agreement and release provided, *inter alia*, that the following be released and discharged: (i) the Diocese, Most Reverend Armando X. Ochoa, and all of the Diocese's related entities, officers, attorneys, employees, and priests; (ii) NOSF and its related entities, officers, attorneys, employees, and brothers; and (iii) Brother Martinez. *See* Settlement Agreement & Release 3.  The formal agreement states that all of the above defendants entered into the agreement and that "Defendant Diocese agrees to pay" the settlement amount. *Id.* at 2.

50.   NOSF paid the Diocese $110,000 on January 17, 2012.

51.   After January 18, 2012, but before January 25, 2012, the Diocese paid the full settlement sum of $1,200,000.

52.     The Diocese seeks to recover $1,200,000 from Interstate less the sum of $110,000 contributed by NOSF.

53.     The Diocese learned sometime in 2012, through another case filed in New Mexico against NOSF, that NOSF had insurance coverage.

G.   *Lloyd's Agreement to Pay Policy Limits Concerning J.A. and A.M.'s Settlements*

54.     The underlying insurance carrier for both J.A. and A.M.'s claims is Lloyd's of London.

55.     The abuse asserted by J.A. occurred during the period of time covered by Interstate and Lloyd's policies.  Interstate's indemnity policy covering J.A.'s claim is designated as Exhibit 3.  Lloyd's indemnity policy covering J.A.'s claim is designated as Exhibit 2.

56.     The allegations of abuse asserted by A.M. occurred during the period of time that was exclusively covered by Lloyd's policy.  Lloyd's indemnity policy covering A.M.'s claim is designated as Exhibit 1 (hereinafter A.M.'s Indemnity Policy).

57.     Prior to mediation, the Diocese was advised by Lloyd's counsel that Lloyd's would pay its policy limits on J.A. and A.M.'s claims.  Lloyd's reimbursed the Diocese for both J.A. and A.M.'s claims.

58.     Lloyd's did not maintain that there was any apportionment required, nor did it dispute its liability for J.A. and A.M.'s settlement sums.

H.   *Demands on Interstate for Reimbursement*

59.     On December 15, 2011, prior to mediation, counsel for the Diocese sent a copy of J.A. and A.M.'s settlement demands to counsel for Interstate.

60.     Counsel for the Diocese, Francis Ainsa and David Driscoll, requested that counsel for Interstate acknowledge that Interstate will indemnify the Diocese for a settlement within the policy limits.  Counsel for the Diocese also requested that Interstate send a

representative to the mediation scheduled for December 19, 2011. A copy of the

Diocese's written request is designated as Exhibit 11 (hereinafter Diocese Letter Dated

Dec. 15, 2011).

61.     Counsel for Interstate, D. Bradley Dickinson, responded to the December 15, 2011, letter

via electronic communication on December 16, 2011. *See* Trial Ex. 12 [hereinafter

Interstate Letter Dated Dec. 16, 2011]. In pertinent part, counsel for Interstate responded

that Interstate's "policies of insurance are indemnity, not general liability, policies." *Id.*

at 1. Counsel further stated that "the policies of indemnity insurance do not impose a

legal obligation upon [Interstate] to participate in or fund any settlement until such time

as the Diocese resolves the matter and submits the same for reimbursement." *Id.* Mr.

Dickinson informed counsel for the Diocese that an Interstate representative will attend

the mediation on December 19, 2011, in El Paso, Texas, for "the purpose of remaining

current on the status of [the] negotiations." *Id.*

62.     On December 16, 2011, counsel for the Diocese replied to Mr. Dickinson's response. *See*

Trial Ex. 13 [hereinafter Diocese Reply].

63.     On December 19, 2011, Mr. Dickinson attended the mediation in El Paso, Texas, on

behalf of Interstate. Prior to entry of actual settlement, Interstate's representative was

asked to leave.

64.     At the conclusion of mediation, by letter dated December 21, 2011, counsel for the

Diocese again sought reimbursement of the sum of $1,000,000 from Interstate, a copy of

which is designated as Exhibit 14 (hereinafter Diocese Reimbursement Claim). Therein,

counsel for the Diocese did not inform Interstate that the Diocese has obtained releases

for NOSF and Brother Martinez nor did the Diocese inform Interstate that NOSF had agreed to pay the Diocese the sum of $110,000.

65. On January 25, 2012, Interstate requested that the Diocese provide copies of the settlement documentation to consider the request for reimbursement. *See* Trial Ex. 16.

66. On February 14, 2012, the Diocese provided Interstate with copies of the settlement documentation reflecting the release of the Diocese, NOSF, and Brother Martinez. *See* Trial Ex. 18 [hereinafter Diocese Letter Dated Feb. 14, 2012]. Therein, the Diocese conveyed that NOSF contributed $110,000 toward the settlement amount.

67. On March 30, 2012, Interstate requested that the Diocese provide an explanation regarding the $110,000 payment by NOSF and inquired as to an apportionment of the settlement between the three released parties—that is, the Diocese, NOSF, and Brother Martinez. *See* Trial Ex. 19.

68. On April 11, 2012, the Diocese informed Interstate that there was no apportionment of the settlement among the released parties and the $110,000 payment by NOSF was not included in the request for reimbursement. *See* Trial Ex. 20. On April 12, 2012, the Diocese informed Interstate that although the NOSF settlement check solely referenced the J.A. settlement, the payment was for both the J.A. and A.M. settlements. The letter also reiterated that there was no apportionment undertaken of the settlement in the J.A. case among the three defendants released or the NOSF payment. *See* Trial Ex. 22 [hereinafter Diocese Letter Dated April 12, 2012].

69. Any finding of fact which may also constitute a conclusion of law shall be deemed a conclusion of law, and any conclusion of law which may also constitute a finding of fact shall be deemed a finding of fact.

- 13 -

### III.  Conclusions of Law

*A.  Jurisdiction*

As a preliminary matter, this Court concludes that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2).

*B.  Choice of Law*

It is undisputed by the parties that this Court sits in diversity jurisdiction.  Confirming that this Court sits in diversity jurisdiction, and noting that Texas is the forum state in this matter, the Court applies Texas law as interpreted by the Texas state courts.  *See Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 230 (5th Cir. 2005); *Mid–Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000).  The Court's primary obligation is to make an *Erie* guess as to how the Texas Supreme Court would decide the question before us.  *See Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010).

Under Texas law, insurance policies are interpreted using the same rules that apply to contracts in general.  *See Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 773 (5th Cir. 2004).  When interpreting a contract, a court's primary concern is to give effect to the intentions of the parties as expressed in the instrument.  *See Schneider Nat'l Transp. Ford Motor Co.*, 280 F.3d 532, 537 (5th Cir. 2002).  The policy must be considered as a whole with each provision given effect and meaning.  *See Valmont Energy Steel, Inc.*, 359 F.3d at 773. If a policy is worded so that it can be given a definite or certain legal meaning, then it is not ambiguous, and a court should construe the contract as a matter of law.  *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

C.  *Policy Coverage Disputes Pursuant to Texas Law*

The burden to establish coverage under an insurance policy rests with the insured. *See*

*Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998) (citing *Telepak v. United*

*Servs. Auto. Ass'n*, 887 S.W.2d 506, 507 (Tex. Civ. App.—San Antonio 1994, writ denied)); *see*

*also Emp'rs Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988), *overruled in part on other*

*grounds*, *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996).  The burden to

establish the applicability of the exclusions under an insurance policy rests with the insurer. *See*

*Guar. Nat'l*, 143 F.3d at 193.

In Texas, insurance settlement amounts are allocated based on the "concurrent causes"

doctrine. *See Cooper Indus. LLC v. Am. Int'l Specialty Lines Ins. Co.*, 350 F. App'x 876, 878

(5th Cir. 2009) (*per curiam*) (unpublished) (citing *Comsys Info. Tech. Servs., Inc. v. Twin*, 130

S.W.3d 181, 198 (Tex. App.—Houston 2003, pet. denied) (applying the doctrine to claims

arising from the deaths of two employees)).  Under the doctrine of concurrent causes, when

covered and non-covered perils combine to create a loss, the insured is entitled to recover that

portion of the damage caused solely by the covered peril. *See Allison v. Fire Ins. Exchange*, 98

S.W.3d 227, 258 (Tex. App.—Austin 2002, no pet.); *State Farm Fire & Cas. Co. v. Rodriguez*,

88 S.W.3d 313, 320–21 (Tex. App.—San Antonio 2002, pet. denied).  The doctrine of

concurrent causation is not an affirmative defense or an avoidance issue. *See Allison*, 98 S.W.3d

at 258.  Because the insured can recover only for covered events, the burden of segregating the

damage attributable solely to the covered event is a coverage issue for which the insured carries

the burden of proof. *See Rodriguez*, 88 S.W.3d at 321.  The insured is not required to establish

the amount of damages with mathematical precision, but there must "be some reasonable basis

upon which the [trier of fact's] finding rests." *Id.*; *see Enserch Corp. v. Shand Morahan & Co.*,

952 F.2d 1485, 1494 (5th Cir. 1992). The doctrine of concurrent causation is not limited to cases involving property damage; it also applies to cases involving personal injury. *See Commercial Union Ins. Co. v. Roberts*, 7 F.3d 86, 88 (5th Cir. 1993) (applying the doctrine to a case involving sexual molestation).

The trier of fact may make an appropriate allocation of the settlement between covered and uncovered claims. *See Enserch*, 952 F.2d at 1494–95. That is, "[i]n a dispute between an insurer and its insured concerning an underlying settlement that may have included both covered and non-covered claims under the insurance policy, it is appropriate for the district court to make findings necessary to apportion the settlement between damages that the insurer owes and damages for which the insured has a duty to pay." *See Am. Int'l Specialty Lines Ins. Co. v. Res-Care, Inc.*, 529 F.3d 649, 656 (5th Cir. 2010) (citing *Enserch*, 952 F.2d at 1494). Nevertheless, the district court's job is not to retry the underlying suit. *Id.*

The allocation of claimant's damages is based on evidence upon which the settlement of the underlying suit is based. *See Enserch*, 952 F.2d at 1494. As such, the trier of fact "can consider any facts that could have been considered in the underlying lawsuit itself." *Res-Care*, 529 F.3d at 656 (quoting *Enserch*, 952 F.2d at 1494) (internal citations and quotations omitted). However, circuit precedent does not limit the district court to evidence admissible at trial. *Id.* ("The [insured] contends that *Enserch* necessarily limited the district court to considering *only* the evidence that would have been admissible at trial. . . . We do not agree with such a narrow reading of our *Enserch* decision."). Any evidence that is "truly relevant" is admissible at the allocation trial. *See id.* "It is important to remember that the goal of the allocation trial is not to conduct a full blown retrial of the merits of the underlying plaintiff's claims, but rather to determine what portion of the settlement was reasonably intended to concern claims covered by

- 16 -

the policy at issue." *Id.* at 657.  Accordingly, district courts are afforded "considerable leeway in deciding what facts are *truly* relevant to the apportionment decision, [thereby, preventing] a full-blown retrial of the underlying lawsuit." *Id.* at 656 (emphasis added).  "The effect of this 'leeway' is to expand, not contract, the [court's] discretion in considering apportionment evidence." *Id.* at 657.

In viewing the evidence, courts must conduct an inquiry as to "how the parties viewed the merits of the plaintiff[s'] claims at the time of the settlement." *Id.* (citing 1 Allan D. Windt, Insurance Claims & Disputes § 6:31 (5th ed. 2008)); *accord* 2 Allan D. Windt, Insurance Claims & Disputes § 6:31 (6th ed. 2013) ("The actual merit of each plaintiff's claims against the insured is not directly relevant.  The only question should be how the parties to the settlement viewed the relative merits of the plaintiff's claims at the time of the settlement . . . .").  To determine a reasonable allocation from viewpoint of the settling insured, "all information is potentially relevant," including but not limited to "internal memoranda, correspondence between the insurer and the insured, communications with the injured party, investigative reports and statements, and even assessments of how sympathetic the plaintiffs would be at trial." *Res-Care*, 529 F.3d at 657 & n.12 (holding that "in any post facto analysis of settlement claims, if the district court is able to make an allocation of the settlement amount, it should accept whatever evidence is available regarding the intent behind the settlement decision" (citing *Am. Home Assurance Co. Libbey-Owens-Ford Co.*, 786 F.2d 22, 31 (1st Cir. 1986))).

D. *Analysis*

    i.  Coverage

        a.  <u>Named Insured</u>

The Court begins its analysis with the language of the insurance policy. The Interstate Policy unambiguously states by endorsement that the insured is the "Roman Catholic Diocese of El Paso [and] The Most Reverend Raymundo Peña, Bishop and His Successors." Interstate Policy 7. Accordingly, as the parties concede, the Interstate Policy unambiguously provides coverage for the "Roman Catholic Diocese of El Paso [and] The Most Reverend Raymundo Peña, Bishop and His Successors." *Id.* NOSF and Brother Martinez are not expressly listed as insureds under the policy and the named insured, the Diocese, sets forth no evidence that either NOSF or Brother Martinez are deemed insureds under the Interstate Policy. Rather, both Interstate and the Diocese agree that NOSF and Brother Martinez are not covered under the Interstate Policy. Thus, any payment made by the Diocese on behalf of the persons or entities not listed as an insured may not be subject to reimbursement pursuant to the Interstate Policy of excess indemnity coverage.

> b. Covered Loss

According to the plain language of the Interstate Policy, "[t]he provisions of the immediate underlying policy [i.e. Lloyd's Indemnity Policy] are incorporated as a part of this policy. . . ." Interstate Policy 3. Likewise, the immediate underlying policy provides that a claim is covered if the Diocese suffered an "ultimate net loss" on account of personal injuries or property damage that arose from an "occurrence" during the policy period, through adjudication or compromise. *See id.* at 16. The policy also provides that the phrase "ultimate net loss" means the "total sum which the Assured [i.e. the Diocese] becomes obligated to pay" including costs associated with "litigation, settlement [and] suits which are paid as a consequence of any occurrence covered hereunder." *Id.* Further, the underlying agreement states that the underwriters agree, subject to certain limitations provided in the agreement, "to indemnify the

- 18 -

Assured [i.e. the Diocese] for all sums which the Assured shall be obligated to pay by reason of

the liability imposed upon the Assured or assumed by the Named Assured under contract or

agreement." *Id.* at 14.  Similarly, Interstate defines "loss" as the "sums paid as damages in

settlement of a claim or in satisfaction of a judgment for which the insured [i.e. the Diocese] is

legally liable . . . ."  Interstate Policy 3.

  While the parties stipulate that "occurrence" is defined as an "accident or happening or

event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally

results in personal injury [ ] or damage to property," Interstate asserts that the allegations of

sexual molestation and abuse attributed to Brother Martinez and NOSF's claims cannot satisfy

the definition of "occurrence" under the policy because Brother Martinez and NOSF's claims

constitute "intentional and knowing conduct."  Interstate Opening Br. 2, ECF No. 37.  The

Diocese does not dispute this contention; instead it maintains that the settlement amount paid by

the Diocese does not cover claims attributed to Brother Martinez or NOSF.  Diocese Opening Br.

3, ECF No. 38.  Correspondingly, the Diocese contends that the term "loss" is at issue because

here the Diocese claims the settlement amount paid by the Diocese was solely to settle claims for

which it is legally liable.  *See id.* at 2.  Irrespectively, both parties concede that if the settlement

amount were to include claims attributed to Brother Martinez or NOSF, the Diocese would not

be permitted to seek reimbursement pursuant to the relevant insurance policies.

  c. <u>Settled Claims</u>

  Upon considering the parties' dispute as to whether the Diocese's settlement agreement is

covered under the Interstate Policy, the Court observes a small, yet noteworthy distinction

between the parties' arguments.  While Interstate contends that the Diocese is not entitled to

reimbursement because the settlement agreement included claims against Brother Martinez and

- 19 -

NOSF, the Diocese alleges that notwithstanding this fact, the settlement *amount* only covers

those claims asserted against the Diocese.  Though Interstate alleges that Brother Martinez and

NOSF's claims appear to be settled, the parties do not present any evidence nor can the Court

find any evidence that the claims asserted against NOSF and Brother Martinez were released

because a sum of money was paid to plaintiffs on their behalf.  As such, the Court finds that

settlement of the underlying suit does not necessarily indicate that a monetary value is attached

to each individual claim.  In accord, the Court reviews relevant evidence concerning the claims

made against NOSF and Brother Martinez to "determine what portion of the settlement was

reasonably intended to concern claims covered by the policy at issue." *Cooper Indus.*, 350 F.

App'x at 878 (internal citations and quotations omitted).

 Here, the parties of the underlying suit were ordered to participate in mediation by the

presiding state court judge.  Upon being informed of the court-ordered mediation, counsel for

Interstate responded in a letter dated December 16, 2011, that its policies "contain a provision

providing for cooperation with the insurance carriers."  Interstate Letter Dated Dec. 16, 2011, 1.

Also therein, Interstate stated it "will have a representative attend the mediation in El Paso for

the purpose of remaining current on the status of [the Diocese's] negotiations." *See id.*  The

parties, counsel for the respective parties, and counsel for Interstate, Mr. Dickinson, attended the

mediation.  During the course of mediation, counsel for Interstate was asked to make some

commitments on the part of Interstate regarding reimbursement prior to settlement; however,

counsel for Interstate declined to make any such commitment.  Consequently, the Diocese asked

Interstate's counsel to go into a separate room.  A settlement agreement was entered by the

parties shortly thereafter.[4]

---

 [4] Even though counsel for Interstate was not physically present at the time the parties initially
decided to enter into the settlement agreement, the Interstate Policy specifically states that Interstate "at

During the initial stages of mediation, the Diocese and NOSF and their respective counsel were in separate rooms. Specifically, the Diocese was in one room and NOSF was in a separate room. *See* Diocese Summ. of Dep. 3, ECF No. 35 ("During the [m]ediation[,] the Diocese of El Paso was in a separate room from the Christian Brothers and Brother Samuel Martinez."). Based on the above facts and the relevant evidence, the Diocese initially agreed to settle its claims for $1.2 million. *See id.* When the plaintiffs of the underlying suit decided to accept the settlement amount from the Diocese and, correspondingly, dismiss the claims asserted against the Diocese, NOSF requested the Diocese to assist in negotiating a release for NOSF. *See id.* at 4; Interstate Summ. of Dep. 7, ECF No. 36 ("Q[:] Did NOSF ever specifically request the Diocese to negotiate a release of NOSF from the claims of J.A. and A.M.? A[:] Yes."). Though the Diocese had already achieved settlement with respect to its claims, evidenced by the informally prepared handwritten J.A. & D.A. Agreement, NOSF and Brother Martinez endeavored to also be released from the claims asserted against them. *See id.*

All parties of the underlying suit entered into a handwritten settlement agreement which provides that "[t]he Diocese of El Paso agrees to pay $1,200,000[,] in full settlement of all claims" in the underlying suit. J.A. & D.A. Agreement 1. The agreement further provides that presumably[5] the plaintiffs of the underlying suit "agrees [sic] to accept the sum of" money "and to dismiss their case.*" *See id.* The agreement states that the monetary sum "shall be paid on or

---

its own option may" "participate in the investigation, *settlement* or defense of any claim or suit against the insured." Interstate Policy 5. Given that the purpose of mediation is to assist the out-of-court settlement of a dispute, it is unclear as to why counsel for Interstate agreed to be absent from the settlement discussions when Interstate expressly reserved the right to be present in settlement discussions in its policy. *See id.*; *see also* Jay Grenig, 1 Alt. Disp. Resol. § 4:1 (3d ed.) (West 2013) (citing Tom Arnold, *A Practical How–To Guide for Mediators and Attorneys, in II Alternative Dispute Resolution; How to Use It to Your Advantage* 581, 588 (1994)). Though Interstate alleges that it was unaware of the fact that the Diocese was attempting to settle the underlying suit, the Court finds that Interstate's position is curious given the very nature of mediations.

[5]  Considering the nature of the underlying suit, the Court concludes that the redactions of the J.A. & D.A. Agreement are the names of the plaintiffs in the underlying suit.

before [March 31, 2012]." *Id.* On the left side of the page, a corresponding asterisk (*) is followed by the caption: "ON APRIL 1, 2012 AGAINST ALL DEFENDANTS." *Id.* Only the signatures of counsel for NOSF immediately follow the above caption on the left side of the page. The Diocese alleges that this discrepancy is due to the fact that the handwritten settlement agreement originally provided that the settlement sum was being paid by the Diocese in exchange for dismissing those claims asserted solely against the Diocese. *See* Diocese Opening Br. 9. But, an asterisk was added at the conclusion of mediation to also include dismissal of the claims against NOSF and Brother Martinez. *See id.* The Diocese alleges that at this time, however, there was no intention that any part of the $1.2 million was foreordained as payment for claims against NOSF or Brother Martinez. *See* Interstate Summary of Dep. 7 (Q[:] There was no agreement reached prior to the settlement with the plaintiffs as to what amount the NOSF was going to pay. Is this correct? A[:] That's correct. Q[:] Okay. So this came about after the settlement had actually been reached? A[:] Yes."). Interstate has not presented any evidence to dispute the Diocese's contention.

The formal Settlement Agreement and Release was executed on January 17, 2014. The release provides that it is entered between J.A. and D.A. (the Plaintiffs) and the Diocese, NOSF, and Brother Martinez (collectively, the Defendants). *See* Settlement Agreement & Release 1. "The purpose of the Settlement Agreement and Release is to achieve a full and complete settlement of all claims and causes of action presently set forth or which could have been asserted [in the underlying suit]." *Id.* at 2. By entering this agreement, Defendants "do not acknowledge liability or responsibility for the causes of action . . . but specifically deny liability and responsibility." *Id.* In consideration of the release, "Defendant Diocese agrees to pay to the

[Plaintiffs $1.2 million on or before January 19, 2012]." *Id.* The section concerning the terms of the release provides that:

> Plaintiffs completely and unconditionally release and forever discharge the following persons and entities:
>
> a. Defendant [Diocese], Most Reverend Armando X. Ochoa, and all of Defendant [Diocese's] related entities, officers, attorneys, employees, and priests;
>
> b. Defendant NOSF [] and all of its related entities, officers, attorneys, employees, and brothers; [and]
>
> c. Brother [] Martinez.
>
> The above-mentioned persons and entities are unconditionally released and forever discharged from any and all claims . . . .

*Id.* at 3. While NOSF, Brother Martinez and their respective counsel did not sign the Settlement Agreement and Release, the agreement clearly provides that all claims and parties in the underlying suit, irrespective as to whether NOSF or Brother Martinez contributed to the settlement amount, are settled and released. *See id.* at 2–3.

Having considered the parties' contentions, the Court finds that the language set forth in the Settlement Agreement and Release is unambiguous as to which claims are settled and released. The language plainly states that the named defendants in the underlying suit are "unconditionally released and forever discharged from any and all claims, demands, damages, costs, expenses, causes of action or suits set forth in the [underlying lawsuit] . . . whether known or unknown, at law or in equity, that could have been, but which were not asserted in the [underlying lawsuit]." *Id.* at 3. Giving effect to all contractual provisions, and ensuring that none will be rendered meaningless, the Court finds that the Settlement Agreement and Release settles *all* claims asserted in the underlying suit, including the claims asserted against NOSF and

- 23 -

Brother Martinez. While the Diocese contends that the claims asserted against NOSF and

Brother Martinez were not settled, rather released, the plain terms of the agreement provide

otherwise. Furthermore, the Court notes that the Diocese does not dispute the terms as expressed

in the Settlement Agreement and Release. As such, the Court concludes that the underlying

settlement includes covered and non-covered claims. While all claims have been settled, it is not

presumed that a monetary value is attributed to each individually settled claim nor do we find

any rule of law that requires a plaintiff to receive compensation from a released defendant who

settles his claim for zero dollars.[6] In accord, it is necessary to allocate the settlement between

damages that the insurer owes and damages for which the insured has a duty to pay.

    ii.   Allocation of Claimant's Damages

        The Court now determines "what portion of the settlement was *reasonably intended* to

concern claims covered by the policy at issue." *See Res-Care*, 529 F.3d at 657 (emphasis

added). In making that determination, the Court views the merits of the plaintiffs' claims at the

time of the settlement of the underlying suit from the viewpoint of the settling insured. *See id.*

        Viewing the Settlement Agreement and Release, the Court observes that the formal

agreement does not apportion the damages with respect to each claim or party. Although the

Settlement Agreement and Release articulates that the Diocese agrees to pay $1.2 million, the

agreement does not expressly state or imply that the $1.2 million is intended to cover those

---

[6] *See Kinch v. Big Lots Stores, Inc.*, Civ. A. No. 807CV121-EAJ, 2008 WL 660289, at *1 (M.D. Fla. Mar. 6, 2008) (acknowledging that "[t]he joint proposal for settlement stated that Plaintiffs would dismiss all claims against Big Lots upon payment of a total dollar amount to Plaintiffs[; however,] Defendant notified Plaintiffs that it was accepting the settlement offer of zero dollars that was apportioned to [one of Defendant's employees] but was rejecting the offer as to [Defendant's other employee]."); *see also DeNardo v. Rodriguez*, No. 92C-02-026, 1993 WL 81319, at *1 (Del. Sup. Ct. Feb. 12, 1993) *aff'd sub nom.*, *De Nardo v. Rodriguez*, 630 A.2d 1102 (Del. 1993) ("The estate claim under the survival statute was settled for zero damages."); *In re Peter J. Schmidt Co., Inc.*, No. 92-695, 1993 WL 157721, at *2 (Bankr. D. Del. Mar. 29, 1993) ("Schmitt concludes Sandridge's claim is finally settled at zero, and that the December 10 order bars Sandridge from attempting a second time to recover upon that claim.").

damages resulting from the claims against NOSF and Brother Martinez. Since the underlying

settlement agreement specifically denies any liability, the Court begins its inquiry with the

underlying mediation. The parties concede that prior to mediation, the plaintiffs in the

underlying suit made a settlement demand of $4.5 million to the Diocese. Based on the

stipulated facts, it appears that only the Diocese was aware of the settlement demand because

NOSF and Brother Martinez represented to the Diocese and to plaintiffs' counsel they were

unable to financially contribute to a settlement. Although the settlement demand was only

addressed to the attorney for the Diocese, that demand was not accepted. Nevertheless, the

Diocese was of the opinion that there was a "reasonable probability that, if the case [were to go]

to trial, a jury would award damages against the Diocese [] in excess of policy limits." *See*

Diocese Letter Dated Dec. 15, 2011, 1.

Subsequently, the parties participated in a court-ordered mediation. The Diocese, NOSF,

and Brother Martinez were in separate rooms during mediation. *See* Summ. of Dep. 3–4;

Diocese Opening Br. 8. As asserted by the Diocese, the Diocese initially settled its claims for

$1.2 million. NOSF and Brother Martinez were not involved in the amount negotiated by the

Diocese. Only after it reached a settlement agreement with respect to its claims did the Diocese

assist in acquiring a release for its co-defendants NOSF and Brother Martinez. *See* Diocese

Summ. of Dep 4; Interstate Summ. of Dep. 7. Although Interstate was informed of the mediation

and had a representative attend the mediation, Interstate does not dispute these contentions.

Nonetheless, a release of NOSF and Brother Martinez did not increase or decrease the settlement

amount. Given the fact that the Diocese was willing to pay $1.2 million for its claims regardless

as to whether or not the plaintiffs would release the other co-defendants, the question is whether

the Diocese paid any money to settle the claims asserted against NOSF and Brother Martinez.

*See* Diocese Opening Br. 20 ("The uncontradicted testimony of Bishop Ochoa, Fr. Celino and, especially, Mario Martinez establish that the Diocese had already agreed to pay $1,200,000 to settle the plaintiffs' claims against the Diocese when NOSF asked to be released.").

Considering the viewpoint of the settling insured, the Diocese asserts that they valued the plaintiffs' claims against the Diocese at more than $1.2 million; and that if they had proceeded to trial, the Diocese reasonably believed that the plaintiffs would be awarded damages over the sum of $1.2 million given the testimony that was to be elicited and the surrounding media attention. The Diocese was advised by plaintiffs' counsel in the underlying case that he intended to call ten former students who also alleged to have been abused by Brother Martinez during his tenure at Cathedral High; a plaintiff's wife who would testify that her marriage was in serious trouble as a result of the abuse her husband endured; and a psychologist for a plaintiff who would state that there was a significant chance that the plaintiff might commit suicide. *See* Diocese Opening Br. 10–11; Summ. of Dep. 2–3. Aside from how sympathetic the witnesses purported to be, the Diocese also considered the plaintiffs in the underlying case to be very credible. *See* Diocese Opening Br. 11; Summ. of Dep. 3. The Diocese was also concerned about the adverse publicity that the Diocese had received both locally and nationally concerning other sexual abuse claims by church officials. This concern appears to have been heightened during the course of the mediation, when the mediator—who had settled previous sexual abuse cases in Santa Fe, New Mexico—recommended that the Diocese settle its liability for $1.2 million based on his past experience involving cases of a similar nature. *See* Summ. of Dep. 3. Further, the Diocese reflected on two past lawsuits in El Paso County, Texas, that were each settled for approximately $1 million. While Interstate alleges that the above evidence would not be admissible in the underlying suit if the case had proceeded to trial, the Court finds that such evidence is certainly

relevant and applicable because it evidences the factors that influenced the Diocese's decision to settle the case against it. *See Res-Care*, 529 F.3d at 657. In any event, although all claims were settled, there is no evidence that any part of the settlement amount was for the claims asserted against NOSF and Brother Martinez.

Interstate, nonetheless, urges the Court to consider the Diocese's prior course of dealing and find it determinative with respect to this case. Specifically, Interstate points out that in two prior child sexual molestation cases involving the Diocese and NOSF, the NOSF paid 70 to 90 percent of each of the $1 million settlements, and the Diocese paid the remaining amount. Thus, Interstate contends that this prior course of dealing between the Diocese and the NOSF evidences how the two entities generally apportion responsibility for settlements. *See* Interstate Opening Br. 6. Notwithstanding Interstate's contention, and after reviewing the evidence of the Diocese and NOSF's prior settlements, the Court does not find that such evidence is determinative with the inquiry at issue—that is, "how the parties viewed the merits of plaintiff[s'] claims *at the time of settlement*." *See Res-Care*, 529 F.3d at 657 (emphasis added). There is little to no evidence presented to the Court that the Diocese and NOSF intended to settle the claims of the underlying suit in a similar manner to how settlements were previously apportioned. Additionally, there is no evidence that the plaintiffs required any money on behalf of each defendant or claim before releasing the parties and claims in the New Mexico lawsuit.

The Court observes that notwithstanding NOSF's inability to pay prior to mediation, sometime after the initial handwritten settlement agreement was drafted by the parties, NOSF informed the Diocese that "it could pay $110,000 toward the settlement amount." *See* Diocese Letter Dated Feb. 14, 2012, 3 ("[It] was not until the day of the mediated settlement that [NOSF]

- 27 -

indicated that it could pay $110,000 toward the settlement amount.").[7]  While NOSF had

maintained that it was "essentially insolvent" during litigation and could not "contribute any

meaningful amount to any settlement that was negotiated," NOSF fortuitously sold a piece of

property affording NOSF additional funds that were not previously available. *See id.*; Trial Ex.

20, at 2 [hereinafter Diocese Letter Dated April 11, 2012] ("Prior to the final settlement with [the

plaintiffs, the NOSF] advised [the Diocese] that they could contribute $100,000."); Interstate

Summ. of Dep. 7 ("[A] fortuitous event occurred that the Order had sold a piece of property and

money did come on board that was not available prior to all negotiations taking place.").  Even

though the Diocese intended for the $1.2 million to cover the claims asserted solely against them,

before the final settlement was reached, NOSF decided to contribute a sum of money to the

Diocese as a show of good faith.  *See* Interstate Summ. of Dep. 6–7 ("There's a history between

[NOSF] and the Diocese [] that goes back probably close to 100 years and as an indicator of

good faith [and] to assist the Diocese. . . . the money was offered as a part of the settlement or

offered as a part of the amount the Diocese had agreed to pay, just to reduce out-of-pocket

money paid by the Diocese.").  Thus, subsequent to mediation and prior to the final settlement,

NOSF informed the Diocese that it would contribute $110,000 to the settlement of the

underlying suit.  *See* Diocese Letter Dated April 11, 2012, 2.  Though NOSF and the Diocese did

not enter into a written contract documenting how much NOSF would contribute to the

settlement amount, NOSF orally informed the Diocese that it would pay $110, 000.  *See id.*

Counsel for the Diocese received the check from NOSF in the amount of $110,000 on January

18, 2012, and counsel delivered the check to the Diocese.  *See id.* ; *see also* Diocese Reply 1

("We will not receive any financial support for any settlement that might be negotiated.

---

[7]  *See also* Interstate Summary of Dep. 7 (Q[:] There was no agreement reached prior to the settlement with the plaintiffs as to what amount the NOSF was going to pay. Is this correct? A[:] That's correct. Q[:] Okay. So this came about after the settlement had actually been reached? A[:] Yes.").

Conversely, the [p]laintiffs [in the underlying suit] will be told that any judgment that they take against the Christi[an] Brothers will be uncollectable."). The Diocese concedes that the said check was earmarked for the underlying settlement sum. *See* Diocese Letter Dated April 12, 2012, 1. Though the evidence supports that NOSF paid the Diocese $110,000, it is not supported by the record that NOSF was legally responsible for said sum or that the parties agreed to apportion the damages between them. Rather, it appears that NOSF voluntarily paid the Diocese a sum of money as a "goodwill gesture" based on a "long-time relationship" between NOSF and the Diocese. *See* Interstate Summ. of Dep. 4.

Lastly, while the Diocese's $1,200,000 settlement was reasonably intended to concern claims covered by the policy at issue, "Interstate is entitled to a credit of $200,000 due to the underlying Lloyd[] policy of $150,000 and the self-insured retention of $50,000." *See* Diocese Letter Dated Feb. 14, 2012, 2. In accordance with the terms of the insurance policies, Interstate is liable only after the Diocese satisfies the first $200,000. Therefore, the Diocese is entitled to recover the sum of $1,000,000, less the sum of $110,000 contributed by NOSF, from Interstate.

iii.   Reasonableness of Settlement

While counsel for Interstate attended the court-ordered mediation, the counsel for Interstate declined to make a commitment with respect to a settlement amount and was not present when the Diocese achieved a settlement. "'Under Texas law, where an indemnitee enters into a settlement with a third party, it may recover from the indemnitor only upon a showing that potential liability existed, and that the settlement was reasonable, prudent, and in good faith under the circumstances.'" *See XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 152 (5th Cir. 2008) (quoting *Ins. Co. of N. Am. v. Aberdeen Ins. Servs.*, 253 F.3d 878, 888 (5th Cir. 2001)); *see also Transamerica Ins. v. Avenell*, 66 F.3d 715, 721 n 15 (5th Cir. 1995).

- 29 -

"The settling indemnitee need not prove actual liability to the third party before recovering from the indemnitor." *See Aberdeen Ins. Servs.*, 253 F.3d at 878. Rather as the Texas Supreme Court and our appellate court have maintained, the indemnitee must "establish that from its standpoint the settlement was made in good faith and was reasonable and prudent under the circumstances." *See XL Specialty Ins.*, 513 F.3d at 152–53 (quoting *Mitchell's, Inc. v. Friedman*, 303 S.W.2d 775, 779 (Tex.1957); *accord Aerospatiale Helicopter Corp. v. Universal Health Servs., Inc.*, 778 S.W.2d 492, 500 (Tex. App.—Dallas 1989, writ denied) (citing *Pan American Gas Co. v. Natural Gas Const. Corp.*, 418 S.W.2d 380, 381 (Tex. Civ. App.—Waco, 1967 writ ref'd n.r.e.)).

Here, there is no allegation that the $1.2 million settlement was not reasonable, prudent, or made in good faith. Moreover, as discussed *supra*, the Court finds that given the evidence against the Diocese in the underlying suit, the Diocese sufficiently established that the settlement was made in good faith and was reasonable and prudent under the particular facts and circumstances of the underlying suit and the factors influencing the Diocese's decision to settle the claims against it.

iv. Defendant's Remaining Counterclaims

Apart from the declaratory judgment that both Plaintiff and Defendant seek, the Diocese also alleges three separate but related causes of action. While the parties only briefly, if at all, addressed the following claims in their opening and closing submissions to the Court, the Court concisely addresses each of the claims.

a. Breach of Contract

A breach of a promise to pay is a breach of contract. *See Barrios v. Enterprise Leasing Co.*, 110 S.W.3d 185, 189 (Tex. App.—Houston 2003, no pet.), *judgment rev'd on other grounds*, 156 S.W.3d 547 (Tex. 2004). But a breach of contract cannot occur until a party fails

- 30 -

or refuses to do something he has promised to do. *See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston 2003, no pet.).

In this case, Counter-Defendant Interstate cannot be in breach of the contract until after the Court has determined the amount due under the parties' insurance contract and entered a judgment for the amount due. Because Interstate did not know what amount of the settlement was attributable to claims not covered under the applicable indemnity policy, Interstate has not, to date, breached the policy. In this case, the insurance contract is clearly a valid contract, however, there has, to date, been no breach of that agreement. While Interstate is obligated to reimburse the Diocese for a portion of the settlement amount that is covered by the indemnity policy and advanced by the Diocese, that amount was determined in this action. Accordingly, until this Court renders a judgment in this case which Interstate refuses to pay, no breach has occurred.

   b. <u>Violation of the Texas Deceptive Trade Practices Act and the Texas Insurance Code</u>

Under Texas law, an insurer violates Section 17.46 of the Texas Debt Trade Practices Act ("DTPA") and the Texas Insurance Code for unfair settlement practices "if it has no reasonable basis for denying or delaying payment of a claim." *See Henry v. Mut. of Omaha Ins. Co.*, 503 F.3d 425, 429 (5th Cir. 2007) (citing *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997)). The evidence confirms that Interstate did have a reasonable basis for initially denying and delaying coverage because the Diocese's settlement involved a potential sum attributable to individuals and entities that were not covered by the Interstate indemnity policy.

- 31 -

d. <u>Violation of Duty of Good Faith</u>

An insurer breaches its duty of good faith and fair dealing when it denies or delays a claim without a reasonable basis and the insurer knew or should have known that no reasonable basis to deny or delay the claim existed. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55 (Tex. 1997). An insurer does not breach its duty by merely denying a claim in error. *See U.S. Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997). If there is a bona fide dispute about the insurance company's obligations under the contract, the insurer's denial or delay does not rise to the level of bad faith as a matter of law. *See Marquis Acquisitions, Inc. v. Steadfast Ins. Co.*, 409 S.W.3d 808, 814 (Tex. App.—Dallas 2013, no pet.) (citing *In re Segerstrom*, 247 F.3d 218, 228 (5th Cir. 2001)).

Interstate posits that it had a reasonable basis for believing that the settlement amount paid by Diocese included claims that were not covered by Interstate's policy. The evidence sets out the existence of a bona fide dispute. Because Interstate's liability was not reasonably clear, the Court finds that Interstate did not breach its duty of good faith and fair dealing.

## IV.  Conclusion

For all the forgoing reasons,

**IT IS HEREBY ORDERED** and **DECLARED** that:

i.   The Catholic Diocese of El Paso is a named insured under Interstate Fire & Casualty Company's policy of excess indemnity coverage;

ii.  The Brothers of the Christian Schools (NOSF) and Brother Samuel Martinez are not named insureds under Interstate Fire & Casualty Company's policy of excess indemnity coverage;

iii. The Catholic Diocese of El Paso entered into a written settlement agreement, with the plaintiffs in the underlying suit, in which the Catholic Diocese of El Paso agreed to pay $1.2 million to resolve all claims made against it in the underlying suit;

iv.    The settlement payment by the Catholic Diocese of El Paso in the amount of $1,200,000 was reasonable, prudent, and in good faith under the circumstances;

v.    The Catholic Diocese of El Paso has sufficiently proved that it paid out the amount of $1,200,000 to settle its potential liability in the underlying case, and that the amount, subject to offsets, that exceeds $200,000 is covered under Interstate Fire & Casualty Company's policy of excess indemnity coverage.

vi.    Because it is undisputed by the parties, any funds or monies provided to the Catholic Diocese of El Paso by the Brothers of the Christian Schools (NOSF), to offset the Catholic Diocese of El Paso's out-of-pocket expenses for the claims against the Catholic Diocese of El Paso in the underlying suit, offset the amount of the indemnity owed by Interstate Fire & Casualty Company.

vii.    Based on the Catholic Diocese of El Paso's deductible, self-insured retention, and offset for the payment of $110,000 from the Brothers of the Christian Schools (NOSF), Interstate Fire & Casualty Company has a duty to indemnify the Catholic Diocese of El Paso and shall indemnify the Catholic Diocese of El Paso the amount of $890,000.

**IT IS FURTHER ORDERED** that all other relief sought and not granted is **DENIED**.

**IT IS FURTHER ORDERED** that the Court shall separately consider and rule upon the parties' entitlement to prejudgment and post-judgment interest.  The parties have **fourteen (14) days from the date of this order** to provide supplemental briefing as to whether or not they shall recover prejudgment and post-judgment interest.  *See* Tex. Fin. Code § 302.102; 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED** that the Court shall separately consider and rule upon the parties' Attorneys' Fees and Costs and Bill of Costs.  If the parties believe they are entitled to attorneys' fees and taxable court costs, counsel for the parties **SHALL** submit an accounting of its attorneys' fees within **fourteen (14) days of this order**.  *See* W.D. Tex. Civ. R. 7(j); Fed. R.

Civ. P. 54(d).  The Court will then render a final appealable judgment once the Court determines

if fees and costs should be awarded and the reasonableness of said fees and costs.

So **ORDERED and SIGNED this** <u>19</u> **th day of March, 2014.**

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**